[Nos. D022215. D022232. Fourth Dist., Div. One. Apr. 14, 1995.]

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
ELLEN STEINSAPIR, Real Party in Interest.

**COUNSEL**

Brobeck, Phleger & Harrison, William F. Sullivan, Jennifer A. Kearns, James E. Holst, Christine Helwick, Christopher M. Patti, Gray, Cary, Ware & Freidenrich and Richard A. Paul for Petitioners.

No appearance for Respondent.

Barwick, Rutherford & Scott, Timothy C. Rutherford and Mitchel J. Olson for Real Party in Interest.

**OPINION**

**HUFFMAN, J.**—In April 1992, the chair of surgery informed a female physician she would have to leave the school's residency program by June

1993 if she did not repeat her third clinical year of training. The physician did not repeat the year. She filed an administrative claim in July 1993 and sued the chairman and the school in August 1993 for sex discrimination. The question before us is whether her action is barred by the applicable one-year statute of limitations.

We hold the suit is barred. The statute of limitations began to run on the physician's claims at the time the adverse employment decision was communicated to her, not when it took effect. (*Delaware State College* v. *Ricks* (1980) 449 U.S. 250 [66 L.Ed.2d 431, 101 S.Ct. 498].) The physician may not prolong the life of her causes of action absent some other discriminatory act taken against her within the limitations period. Nor may she resuscitate the causes of action by recharacterizing her termination as a resignation.

### FACTUAL AND PROCEDURAL BACKGROUND

The University of California at San Diego (UCSD) offers a residency in general surgery, a five-year clinical training program after a student has graduated from medical school. Dr. Ellen Steinsapir (Steinsapir) attended medical school at UCSD from 1985 to 1989. She began a residency in general surgery at UCSD in 1989.

Steinsapir asserts, at the end of medical school in 1988, the UCSD chair of Surgery, Dr. Abdool Moossa (Moossa), was late providing a recommendation for her application to the residency program because he had a practice of delaying letters for women seeking surgery placements. Steinsapir adds, before starting her residency, she went to dinner with Moossa and several female students and listened as Moossa expressed his view women should not become surgeons because it interfered with their more important roles as wives and mothers.

Steinsapir maintains, in the fall of 1989, Moossa brushed against her breasts while they were performing surgery. As Steinsapir describes it, Moossa ordered her to stand next to him in the operating room, rubbed his elbow against her breast and, when she moved away, Moossa directed her to "lean forward," adding, "Surgery is a contact sport." When Steinsapir told him she did not want that kind of "contact," Moossa began rapping her knuckles with the surgical instruments as he passed them to the scrub nurse.

Moossa did not make physical contact with Steinsapir on any other occasion.[1]

In March 1992, Moossa informed Steinsapir her performance was unsatisfactory and she would have to repeat her third year or leave the program. Moossa confirmed the conversation in a letter dated April 27, 1992, which stated Steinsapir would not be promoted to the fourth year and added: "I have no objection if you spend the next academic year working in the laboratory with the plastic surgeons. However, if you return to the general surgery program following this elective year, you will have to repeat the third year of your general surgery training."

At no time after receiving the letter did Steinsapir ever contact Moossa to see if he would reverse his decision that she repeat her third clinical year. Nor was she ever advised by anyone that Moossa had changed his mind.

Instead of repeating her third year, Steinsapir worked in the laboratory the next academic year (July 1992-June 1993) as indicated in Moossa's letter. Midway through the year, in January 1993, Steinsapir testified before a committee of surgeons evaluating Moossa's reappointment as chair of surgery for another five years. Steinsapir told the committee about the incident in the operating room in 1989 but complains there was no further investigation. Although the committee recommended Moossa not be reappointed as chair, the chancellor nevertheless reappointed him.

Steinsapir left the residency program on June 30, 1993, when the academic year ended rather than repeat her third year. On July 12, 1993, she filed a claim with the Department of Fair Employment and Housing (Department) and requested a right to sue letter. Steinsapir filed suit against Moossa and the Regents on August 23, 1993. Her complaint presently contains causes of action for (1) sexual harassment (Gov. Code,[2] § 12940, subds. (a), (h)); (2) sex discrimination (§ 12940, subds. (a), (h)); (3) failure to prevent discrimination and harassment (§ 12940, subd. (i)); (4) wrongful termination in violation of public policy; (5) tortious constructive discharge

---

[1]Although Steinsapir also asserts that Moossa made disparaging remarks about women to other residency program applicants, subjected pregnant residents to disparate treatment and harassed other women at various times, these incidents were not directed at Steinsapir and may not be considered. (See *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 611-613 [262 Cal.Rptr. 842].)

[2]All statutory references are to the Government Code unless otherwise indicated.

from employment due to discrimination and harassment; (6) negligent retention; and (7) injunctive and declaratory relief.[3]

Moossa and the Regents moved for summary judgment, asserting the claims were barred by one-year statutes of limitations. The trial court denied the motion. On the statutory Fair Employment and Housing Act (FEHA) causes of action (sexual harassment, sex discrimination, failure to prevent discrimination and harassment, and injunctive and declaratory relief), the trial court explained:

"Defendant's argument that plaintiff's claims are barred fails as a matter of law fails under the continuing violation doctrine as set forth in *Accardi* v. *Superior Court* (1993) 17 Cal.App.4th 341 [21 Cal.Rptr.2d 292]; *Watson* v. *Department of Rehabilitation* (1989) 212 Cal.App.3d 1271 [261 Cal.Rptr. 204]; *City and County of San Francisco* v. *Fair Employment & Housing Commission* (1987) 191 Cal.App.3d 976 [236 Cal.Rptr. 716] and *Williams* v. *Owens-Illinois, Inc.*, 665 F.2d 918 (1982 9th Cir.).

"There is a triable issue of material fact as to whether the enforcement of the repeat requirement for plaintiff in June of 1993 was an act in furtherance of a policy or practice of sex discrimination. If so, the alleged course of conduct would remain actionable 'even if some or all of the events evidencing its inception occurred prior to the limitations period.' *City and County of San Francisco*, 191 Cal.App.3d at 983; *Accardi*, 17 Cal.App.4th at 351."

As to the common law termination causes of action (wrongful discharge in violation of public policy and tortious constructive discharge), the court added: "Defendants have rejected plaintiff's asserted reasons for deciding to 'weather the storm.' [¶] However, under *Turner* [*Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238 (32 Cal.Rptr.2d 223, 876 P.2d 1022)], the reasonableness of plaintiff's decision to wait governs both the merits of the claim for constructive discharge and the effective outer limit beyond which plaintiff may claim constructive discharge."

Finally, the trial court dealt with the cause of action for negligently retaining Moossa when the Regents allegedly knew he engaged in inappropriate conduct toward women, stating: "Having found a triable issue of material fact as to whether plaintiff was harmed by the acts of defendant

---

[3]In August 1994, after the motion for summary judgment was filed, Steinsapir dismissed six causes of action: two were for alleged retaliation against Steinsapir for testifying before the committee; the other four were battery and emotional distress claims. At approximately the same time, Steinsapir also amended her complaint to add a cause of action for constructive discharge.

Moossa after the commencement of the statute of limitations period, the cause of action for negligent retention against the Regents is not time barred as a matter of law."

Moossa and the Regents (collectively defendants) filed petitions for writ of mandate challenging the ruling.[4] We issued an order to show cause.

## DISCUSSION

All of Steinsapir's causes of action are subject to a one-year statute of limitations. A person who files suit for sex discrimination under FEHA must file a claim with the Department within one year from the date the alleged act of discrimination occurred. (§ 12960.) Steinsapir concedes wrongful termination in violation of public policy is a tort action governed by Code of Civil Procedure section 340, subdivision (3) which requires suit within one year.[5] As such, the only question before us on this petition is when the cause of action accrues.

### I

### *Statutory Causes of Action*

█ Defendants argue the statute of limitations begins to run on FEHA claims when the adverse employment decision is communicated to plaintiff, not when it takes effect. (*Delaware State College* v. *Ricks, supra,* 449 U.S. 250.) In line with *Ricks,* they contend the FEHA causes of action are barred because Steinsapir was informed in April 1992 that she would have to repeat her third clinical year to stay on the program—i.e., she was notified more than a year before she filed her administrative claim in July 1993 and/or complaint in August 1993. Defendants add where, as here, the sexual harassment involving Steinsapir occurred in 1989, she had no contact with Moossa after receiving the April 1992 letter and she alleges no further acts of discrimination, the continuing violation doctrine does not make the course of conduct actionable because none of the events occurred within the limitations period. (*Accardi* v. *Superior Court* (1993) 17 Cal.App.4th 341, 345 [21 Cal.Rptr.2d 292].)

---

[4] We consolidated the two petitions for writ of mandate.

[5] It appears to be an open question whether a one-year statute (Code Civ. Proc., § 340, subd. (3)), a two-year statute (Code Civ. Proc., § 339, subd. 1) or a four-year statute (Code Civ. Proc., § 343) governs the cause of action for tortious wrongful discharge. (See *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1254, fn. 7 [32 Cal.Rptr.2d 223, 876 P.2d 1022]; *Funk* v. *Sperry Corp.* (9th Cir. 1988) 842 F.2d 1129, 1133.) Given Steinsapir's concession, however, we need not decide the issue.

Steinsapir counters by attempting to bring herself within the discriminatory promotion cases, specifically *Valdez* v. *City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1053 [282 Cal.Rptr. 726], and *City and County of San Francisco* v. *Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976, 983 [236 Cal.Rptr. 716], applying the continuing violation doctrine to allow suit if there is a "policy of discrimination" even though some events occurred outside the limitations period. Steinsapir chides defendants for "misciting" *Accardi* v. *Supreme Court*, *supra*, 17 Cal.App.4th 341, which she reads as eliminating any need for a violation in the limitations period where a discriminatory promotion policy is involved. She also attempts to distinguish *Delaware State College* v. *Ricks*, *supra*, 449 U.S. 250, pointing out the case does not involve discriminatory promotional practices.

In *Delaware State College* v. *Ricks*, *supra*, 449 U.S. 250, a faculty member alleged the college denied him tenure on the basis of racial discrimination. Although the college had a policy of offering a professor who did not receive tenure a contract for one additional year rather than discharging him immediately, the Supreme Court held the limitations period for title VII and Civil Rights Acts claims began to run at the time that the tenure decision was made and communicated to the teacher. (*Id.* at pp. 257-258 [66 L.Ed.2d at p. 439].) Even though the actual loss of job came later, the court determined: " '[T]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful.' [Citations.] It is simply insufficient for Ricks to allege that his termination 'gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination.' [Citation.] The emphasis is not upon the effects of earlier employment decisions; rather, it 'is [upon] whether any present *violation* exists.' [Citation.]" (*Id.* at p. 258 [66 L.Ed.2d at p. 440], original italics.)[6]

We believe the situation here is analogous to the failure to qualify for tenure in *Ricks*. Steinsapir failed to qualify for fourth year residency and her employment at UCSD was scheduled to end at the close of the next academic year if Steinsapir did not repeat her third year: termination of employment was a "delayed, but inevitable, consequence" of not graduating from—and not repeating a year in—the residency program. (*Delaware State*

---

[6]In a later *per curiam* opinion, the Supreme Court followed *Ricks* in holding the statute of limitations began to run on the date nontenured school administrators received notice they were being terminated, and not the date the employment ended, absent allegations of illegal acts committed after the date of the notice. (*Chardon* v. *Fernandez* (1981) 454 U.S. 6, 8 [70 L.Ed.2d 6, 8-9, 102 S.Ct. 28].) To the same effect, see *Daniels* v. *Fesco Div. of Cities Service Co.* (9th Cir. 1984) 733 F.2d 622, 623 (*per curiam*); *Crossen* v. *Foremost-McKesson, Inc.* (N.D.Cal. 1982) 537 F.Supp. 1076, 1079.

*College* v. *Ricks, supra,* 449 U.S. at p. 258 [66 L.Ed.2d at pp. 439-440].) The statute thus began to run at the time Steinsapir received notice.

*Accardi* is not of much help to Steinsapir in revitalizing her causes of action. The opinion may mouth words from the discriminatory promotion cases—i.e., "a . . . 'systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period' " (*Accardi* v. *Superior Court, supra,* 17 Cal.App.4th at p. 349, citing *Watson* v. *Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1290-1291 [261 Cal.Rptr. 204])—but, contrary to Steinsapir's interpretation, the case still requires discriminatory practices within the limitations period. The *Accardi* court read the complaint to allege a pattern of conduct creating a hostile work environment—conduct that began 10 years ago and *extended* into the limitations period.[7] Indeed, the court expressly held "[a] claim for sexual harassment is not time-barred when there are continuous acts of discrimination over a period of time *provided that some of those acts fall within the limitations period.*" (*Accardi* v. *Superior Court, supra,* 17 Cal.App.4th at p. 345, italics added.)

We also find Steinsapir's attempt to come within *Valdez* v. *City of Los Angeles, supra,* 231 Cal.App.3d 1043, and *City and County of San Francisco* v. *Fair Employment & Housing Com., supra,* 191 Cal.App.3d 976, unavailing. In *Valdez,* plaintiff asserted the city's use of rankings on an oral examination for determining eligibility for promotions was discriminatory toward Hispanic police officers. Similarly, *City and County of San Francisco* concerned use of an allegedly discriminatory written examination for determining firefighter promotions.

Steinsapir's case is "a square peg" in the "round hole" of the discriminatory promotion cases. Steinsapir may be a salaried employee of UCSD but, unlike the employees in *Valdez* or *City and County of San Francisco,* her "employment" is more accurately a five-year "training school." In further contrast to *Valdez* or *City and County of San Francisco,* Steinsapir is not challenging a formalized testing procedure as discriminatory to women or contesting her placement on an eligibility list for promotions: she is not complaining about a "promotion"[8] in the ordinary sense of the word.

Unlike the promotions at issue in *Valdez* or *City and County of San Francisco,* Steinsapir did not have the choice of climbing the employment

---

[7]Plaintiff alleged, within the year before she filed suit, the department continued its campaign by giving light-duty assignments to male officers instead of plaintiff, filing false medical reports that she was no longer disabled and requiring her to declare herself 100 percent fit or quit. (*Accardi* v. *Superior Court, supra,* 17 Cal.App.4th at pp. 350-351.)

[8]We assume one of the reasons for Steinsapir's stress on "promotion" is *Williams* v. *Owens-Illinois, Inc.* (9th Cir. 1982) 665 F.2d 918, the case cited in *Valdez, City and County of*

ladder or remaining in her old job: she could not keep her old position. Steinsapir failed her third year and had to repeat it or she would be terminated in another year like the professor in *Ricks* who failed to get tenure and would be terminated a year later. Steinsapir stated she had been "terminated" from the residency program in the FEHA claim filed with the Department. She called the personnel action a "termination" in her complaint. We see no reason to depart from this characterization.

We are not finished with the analysis until we evaluate, in contrast to *Ricks* where the Supreme Court rejected the continuing violation argument because the professor had not alleged discrete discriminatory acts which continued until the actual termination of his employment, whether Steinsapir has identified such acts. (*Delaware State College* v. *Ricks*, *supra*, 449 U.S. at p. 257 [66 L.Ed.2d at p. 439].) Steinsapir charges: (1) during her year in the lab, she told several faculty members she wanted to be promoted but was repeatedly refused promotion; (2) Moossa's receipt of progress reports on Steinsapir from the head of the lab where she was working indicates Moossa was gathering evidence to support his discriminatory practices; and (3) UCSD failed to take action against Moossa. Steinsapir also suggests the differential between men and women who were not promoted (which she maintains is 13.5 percent and 44.4 percent, respectively) during the 1983-1993 period Moossa chaired the surgery department shows a "policy of discrimination" which violated her rights because other residents advanced to their fourth year on July 1, 1993, and she did not.

Unfortunately, none of these purportedly discriminatory acts qualifies. There is no evidence of repeated refusals to promote Steinsapir.[9] The references to which we have been directed fail to show any request by Steinsapir to be promoted to her fourth year. To the contrary, they amount to little more than missed phone calls during Steinsapir's last days on the job.[10]

As far as Steinsapir's other arguments are concerned, we note, aside from the pure speculation that Moossa was gathering evidence on Steinsapir, the lab progress reports were not raised below and are not properly before us.

---

*San Francisco* and other opinions to explain the doctrine, holds the continuing violation doctrine applies to a denial of promotion, but *not* a termination. (665 F.2d at p. 924.)

[9]We note, in *Ricks*, neither requests for reconsideration nor the pendency of proceedings to review the employment decision were deemed sufficient to extend the limitations period. (*Delaware State College* v. *Ricks*, *supra*, 449 U.S. at p. 261, fn. 15 [66 L.Ed.2d at p. 442].)

[10]The deposition references show: Steinsapir called Dr. Easter three times in June 1993, was unable to reach him and left word for him to call her back; she called Moossa once in June 1993 but did not reach him and may not have left a message; and she wrote a letter to Dr. Easter on the last day of the academic year, June 30, 1993, asking for her schedule.

The alleged failure to act is no different from the negligent retention cause of action, discussed *post*. Finally, with respect to the statistical variation for male and female repeaters, there is no evidence in the record what rate was in effect during the limitations period or whether the difference, if any, was in fact gender related.

In short, Steinsapir has not presented cognizable evidence of discriminatory acts continuing into the limitations period. We are left with only one act in the limitations period—implementation of the decision which was made and communicated to Steinsapir in April 1992—but no present violation.[11]

## II

### *Common Law Termination Claims*

Before discussing the arguments in this section, we set out our understanding of the wrongful termination claims in this case. Steinsapir had a cause of action for wrongful termination in violation of public policy from the inception of the suit: essentially restating the statutory causes of action, she alleges defendants violated public policy by terminating her employment because she was a woman and would not submit to Moossa's physical and verbal harassment of her.

Steinsapir also belatedly inserted a constructive discharge claim in the action.[12] Her cause of action alleges: (1) in spring 1992, defendants informed Steinsapir they would not let her continue in the surgery program unless she repeated her third year; (2) defendants imposed this requirement to sexually discriminate against Steinsapir and make her work environment so intolerable she would resign; (3) Steinsapir worked in the lab from June 1992 to June 1993 but not as a resident; and (4) even if she had received a written offer of employment as a resident, Steinsapir would not have accepted it because the discrimination and harassment created such an offensive working atmosphere that a reasonable woman would have resigned from the residency program.

Moving from the complaint to the summary judgment motion, Steinsapir shifted gears slightly and argued, under *Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th 1238, she was constructively discharged on the date she resigned (June 30, 1993). Steinsapir added that *Turner* makes a factual issue

---

[11]In light of our disposition, we need not reach the issue of whether the continuing violation doctrine applies to Moossa as an individual.

[12]As noted previously, Steinsapir added a cause of action for tortious constructive discharge to the complaint after defendants filed their summary judgment motion. (See fn. 3, *ante*.)

of the question whether it was reasonable for her to postpone her resignation from the residency program for more than a year on the basis that Moossa was being reevaluated in early 1993 and her feeling he might not be reappointed or his decision might be reversed.

In their petition, defendants take the position the trial court improperly applied *Turner* to create an issue of fact on the common law termination causes of action where none existed. They point out, in *Turner*, there was no wrongful termination cause of action, no statute of limitations issue and no express statement the statute begins to run when the employee resigns. Steinsapir counters that defendants conceded her wrongful termination in violation of public policy cause of action encompassed a claim for constructive discharge, the rule that the statute starts running on the date the employee resigns is implicit in the holding in *Turner* and where, as here, suit was filed two months after she resigned, her constructive discharge claims are timely.

First, we turn to *Turner, supra,* 7 Cal.4th 1238. Briefly summarized, in *Turner,* the employee resigned his job and sued for constructive discharge, alleging he was forced to quit because he had been subjected to intolerable conditions after he complained about allegedly illegal conduct. Notably, the employee's reports of illegal activity preceded his resignation by four years. Although the Supreme Court found no merit in the constructive discharge allegations, it nevertheless refused to endorse a rule that would set the statute of limitations as an "outer limit" beyond which an employee may not remain on the job after the onset of intolerable conditions and still be able to sue for constructive discharge. (*Id.* at p. 1254.)

We agree that *Turner* has no direct application to the facts here: the case does not tell us when the statute of limitations begins to run. Further, as defendants point out, in light of the employee's contention that one "intolerable condition" was he received a negative performance review a week before he resigned, *Turner* can hardly be said to eliminate the requirement that an employee demonstrate he was subjected to intolerable conditions within the limitations period. (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th 1238.)

*Turner* is more properly concerned with how events which occur after the onset of the allegedly intolerable conditions might be considered in evaluating whether the employee was forced to resign. As the court explained: "Although we agree with *Panopulos* [*Panopulos* v. *Westinghouse Electric Corp.* (1989) 216 Cal.App.3d 660 (264 Cal.Rptr. 810)] that there is an 'outer

limit' beyond which an employee cannot remain on the job after intolerable conditions arise and still claim constructive discharge, reliance on the applicable limitations period to define that limit is unduly arbitrary. Consistent with our discussion . . . above, the relevant question is what a reasonable employee would have done under the circumstances. The length of time the plaintiff remained on the job may be *one* relevant factor in determining the intolerability of employment conditions from the standpoint of a reasonable person. Neither logic nor precedent suggests it should always be dispositive. [Citation.] Insofar as it prescribes the statute of limitations as an outer limit on an employee's decision to 'weather the storm,' we disapprove *Panopulos*." (*Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at p. 1254, original italics, fn. omitted.) We add, considering the court's staunch refusal to adhere to so "unduly arbitrary" a benchmark as a statute of limitations to define the "outer limit" on a claim, we believe the court would be disinclined to endorse such an equally arbitrary date—and notably one solely within the employee's control—as the date of resignation for the start of a constructive discharge claim. As such, we reject Steinsapir's argument that *Turner* implicitly compels the conclusion the statute did not begin to run until she resigned.

We also have difficulty with the concept of constructive discharge in this case. When we examine Steinsapir's constructive discharge claims under the microscope, they take on the classic proportions of an employer firing an employee and the employee insisting, "You can't fire me because I quit." Constructive discharge must be something more than semantics.

■ As *Turner* describes it, "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign." (*Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at p. 1244.) It "convert[s] what is ostensibly a voluntary quit into a discharge . . . ." (*Id.* at p. 1245.) For such a conversion, ". . . 'the adverse working conditions must be so intolerable that any reasonable employee would resign rather than endure [them].' " (*Id.* at p. 1247, quoting *Slack* v. *Kanawha County Housing* (1992) 188 W.Va. 144 [423 S.E.2d 547, 556].)

■ If constructive discharge means adverse working conditions are so intolerable any reasonable employee would resign rather than endure them, Steinsapir was not constructively discharged. As Steinsapir conceded in both her brief below and her response to the petition, she was not exposed to adverse conditions working in the lab at the time she resigned on June 30, 1993.

Nor can we accept the notion that Steinsapir was "constructively discharged" in June 1993 by virtue of postponing her "resignation" from the

residency program for more than a year after Moossa informed her she would be "terminated." Moossa did not give Steinsapir a choice in the matter: he told her in April 1992 she would have to repeat her third year to stay on as a resident. Steinsapir's recently added constructive discharge cause of action acknowledges as much: it states that Steinsapir received notice in 1992 "[defendants] would not permit her to continue" the program unless she repeated the year, and "[f]rom June 1992 to June 1993, [Steinsapir] worked in a laboratory, and *not as a resident* . . . ." (Italics added.)

Clearly, Steinsapir was terminated. She may not bypass the effect of an "express termination" by characterizing it as a "constructive discharge" or "resignation."

### III

### *Negligent Retention Cause of Action*

As noted above, the trial court found the negligent retention cause of action viable based on the conclusion Steinsapir was harmed by the acts of Moossa after the start of the limitations period. Having determined the only act within the limitations period was implementation of the April 1992 decision, but there was no present violation, we hold there is no basis for the cause of action.

Let a writ of mandate issue directing the superior court to vacate its order of October 7, 1994, denying summary judgment, and enter an order consistent with this opinion. The stay order issued on November 28, 1994, is vacated.

Work, Acting P. J., and Froehlich, J., concurred.

A petition for a rehearing was denied May 8, 1995, and the petition of real party in interest for review by the Supreme was denied July 20, 1995.