[No. S053132. May 29, 1997.]

CORNELIUS MULLINS, Plaintiff and Appellant, v.
ROCKWELL INTERNATIONAL CORPORATION, Defendant and
Respondent.

## COUNSEL

Nick N. Mrakich and Douglas Fee for Plaintiff and Appellant.

Quackenbush & Quackenbush and William C. Quackenbush as Amici Curiae on behalf of Plaintiff and Appellant.

Peck & Loewe, Allan P. Lowe, Paul, Hastings, Janofsky & Walker, Paul W. Cane, Jr., and Jenny C. Wu for Defendant and Respondent.

## OPINION

GEORGE, C. J.—In this case we consider whether the statute of limitations in a breach of contract action based upon an alleged constructive termination of employment begins to run when the alleged intolerable working conditions occur, or instead when employment actually is terminated. The Court of Appeal concluded that the employee's knowledge of intolerable working conditions should be the circumstance that begins the running of the statute of limitations in a case of alleged constructive discharge. We disagree. As in our recent decision in *Romano* v. *Rockwell Internat., Inc.* (1996) 14 Cal.4th 479 [59 Cal.Rptr.2d 20, 926 P.2d 1114] (*Romano*), in which we rejected

notice of termination as the event triggering the statute of limitations in a contract action alleging wrongful termination of employment, we conclude that the statute of limitations runs from the date of actual termination of employment in any contract action for wrongful termination, whether or not constructive discharge is alleged.

## I

Plaintiff Cornelius Mullins was employed by defendant Rockwell International Corporation (Rockwell) for 22 years in various managerial positions. Throughout this time, Mullins received promotions, salary increases, bonuses, and awards. In 1983, Mullins became factory manager of Rockwell's Downey facility, replacing Dan Brown, who was moved to Rockwell's Palmdale facility to work under Sy Rubenstein. From 1983 to 1988, Mullins received excellent performance reviews, and for most of that time he received a salary rank of 18, which was considered an executive level of pay at Rockwell.

In early January 1988, when Rubenstein became president of Rockwell's space transportation division, he requested all executives in his division to submit an account of their personal goals. Mullins responded that at age 56, with 22 years of seniority, he had 76 points toward his retirement goal of 85 points. He expected to work at Rockwell for another four or five years as factory manager. Shortly thereafter, at one of Rubenstein's first staff meetings as division president, Rubenstein commented that you do not have to fire someone, but can "just give them a shit job they can't do and don't talk to them."

On February 2, 1988, Rubenstein announced that for the purpose of construction of the space shuttle Endeavor, he would combine the management of both the Downey and Palmdale facilities and have one director oversee both. Because Brown, Mullins's counterpart at Rockwell's Palmdale facility, had experience in building spacecraft, Rubenstein selected him to be the new director, but assured Mullins that he would not be hurt by the move. On February 4, 1988, Mullins met with Brown and was told that he would head the "back shops." Shortly thereafter, Mullins was reassigned to a new position as project director of manufacturing and testing, which he viewed as a demotion, because the newly created position was not executive level, had no job description, and did not provide for a secretary or staff.

For the rest of his employment at Rockwell, Mullins alleged, his job responsibilities and working environment continually diminished. Although promised important assignments, his only significant assignment in 1988

was to set up a "cold plates" process in the shops, which required less than one day per week of actual work. Mullins spent the rest of his time waiting for assignments that never materialized. He was excluded from executive staff meetings. At the same time, two new directors, former subordinates of Mullins, were appointed to executive level positions. Mullins was not asked to interview for these positions. Further, Brown did not review plaintiff's job performance for 1988 or 1989, despite company policy that required Brown to do so. Rubenstein also refused to approve merit increases for Mullins in 1988 and cut his bonus by two-thirds. This was the first year in 21 years that Mullins failed to receive a raise from Rockwell and the first time in 5 years that his bonus was decreased. On several occasions, Mullins complained to his superior that he had no responsibilities, and he objected to his assignment as project director.

Mullins viewed his situation as the result of "internal politics," because of his relationship with Rubenstein's predecessor, Rocco Petrone, whom Rubenstein disliked. Mullins's coworkers thought of Mullins as a "Petrone man." Although Mullins continued to receive his executive level salary, an internal letter dated June 27, 1988, stated that his position was to be evaluated objectively no later than February 1989, and that he would be assigned a new grade level reflecting his changed responsibilities. Because Mullins's responsibilities were not at the executive level, he expected that this evaluation would lead to a nonexecutive pay level and a loss of current and future benefits, including his anticipated retirement at an executive level. Feeling stressed and humiliated, Mullins took a medical leave of absence from March 18, 1988, to April 24, 1988, and again from January 7, 1989, to September 20, 1989. During such a medical leave, company policy prohibited reevaluation of job classification. His medical leave due to expire, Mullins submitted his resignation to Rockwell on September 20, 1989, and actually retired on an unspecified date in October 1989.

On September 19, 1991, Mullins filed a complaint against Rockwell for constructive discharge and requested damages. The complaint alleged (1) wrongful termination, (2) wrongful termination based upon a breach of the covenant of good faith and fair dealing, and (3) breach of an oral employment contract. Mullins alleged he was forced to resign because Rockwell was going to demote him and reduce his pay and benefit level when he returned from sick leave. He submitted his resignation while still, technically, in a high-level management position. In addition, he alleged the existence of an oral contract of employment arising from his long service, his promotions, his bonuses, his stock rights, the praise given him, and Rockwell's practices and policies, which impliedly prohibited termination of employment except for good cause.

Rockwell sought summary judgment on the ground that all the claims alleged against it were time-barred by the applicable statute of limitations. Rockwell asserted that the first cause of action was barred by the one-year statute of limitations for tort actions set out in Code of Civil Procedure section 340, subdivision (3). As to the second and third causes of action, involving breach of the covenant of good faith and fair dealing and breach of an oral contract, Rockwell maintained that the two-year limitations period in Code of Civil Procedure section 339 applied. The applicability of these limitations periods was not the subject of dispute. Rather, the issue was when these statutes of limitation began to run. Rockwell alleged that these limitation periods began to run on January 19, 1988, when Mullins received word of his alleged demotion, or at the latest on March 18, 1988, when Mullins took his first medical leave. Mullins failed to address Rockwell's statute of limitations argument directly, but instead argued the substantive merits of his claim.

The trial court granted Rockwell's motion for summary judgment on the ground that all claims were barred by the applicable statutes of limitation. The court declared that the first cause of action was barred by the applicable one-year limitations period because Mullins announced his resignation on September 20, 1989, and did not file his complaint until September 19, 1991. The court also declared that "a demotion will not support a constructive discharge claim." The court further held that the second and third causes of action were barred by the two-year statute of limitations set out in Code of Civil Procedure section 339, which "began to run once plaintiff suffered appreciable harm." Because Mullins realized he was demoted when Rubenstein notified him of the change in his status on January 19, 1988 (that is, when he was told Brown would head both the Palmdale and Downey facilities and that some position would be found for him), he suffered appreciable harm at that time. Accordingly, the trial court concluded that his complaint filed on September 19, 1991, was untimely.

Mullins appealed, and the Court of Appeal affirmed. It concluded that even if it were assumed the date of resignation commenced the running of the limitations period for any tort claim, Mullins had failed to file his action within one year of that date. With respect to the contract causes of action, the Court of Appeal declared that the limitations period for a wrongful discharge claim begins when the employee is given notice of termination or "the basis for constructive discharge," not when termination occurs. It reasoned that the limitations period begins when the circumstances have developed such that the plaintiff is entitled to a legal remedy. Applying this theory, it determined that Mullins's contract claims accrued at the latest in January 1989, when he became aware of all the facts underlying Rockwell's new attitude toward him.

## II

The Court of Appeal determined that Mullins's contract claims were barred by the statute of limitations; the court did not consider the merits of the claims. We determine only the issue of when the statute of limitations begins to run in a contract action based upon constructive discharge from employment. Like the Court of Appeal, we need not and do not decide whether the facts upon which Mullins's claim is based are sufficient to support a contract action premised upon a claim of constructive discharge.

We recently examined the constructive discharge doctrine in *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*). ■ We explained that constructive discharge is a termination of employment that is caused by the employer and is against the employee's will. (*Id.* at pp. 1244, 1249.) As we noted, "[a]ctual discharge carries significant legal consequences for employers, including possible liability for wrongful discharge. In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment." (*Id.* at p. 1244.)

We emphasized that constructive discharge occurs only when an employer terminates employment by forcing the employee to resign. (*Turner, supra,* 7 Cal.4th at p. 1244; see also *Scott* v. *Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 468 [46 Cal.Rptr.2d 427, 904 P.2d 834].) A constructive discharge is equivalent to a dismissal, although it is accomplished indirectly. (*Turner, supra,* 7 Cal.4th at p. 1245.) Constructive discharge occurs only when the employer coerces the employee's resignation, either by creating working conditions that are intolerable under an objective standard, or by failing to remedy objectively intolerable working conditions that actually are known to the employer. (*Id.* at p. 1249.) We have said "a constructive discharge is legally regarded as a firing rather than a resignation." (*Id.* at p. 1245.)

We noted in *Turner, supra,* 7 Cal.4th 1238, that courts in various jurisdictions have defined quite differently the requisite intent on the part of the employer. Some require proof of the employer's express intent to secure the employee's resignation through the creation of intolerable conditions, while some require only that the employer have constructive knowledge that intolerable conditions exist. We concluded that proof of express intent to discharge is not required, because the employer's intent rarely will be

revealed by direct evidence. (*Id.* at p. 1249.) We rejected a constructive knowledge standard, however, as providing insufficient support for the goal of informal conciliation in the workplace. (*Id.* at p. 1248.) We did not find it appropriate to permit the employee to institute a lawsuit without giving the employer some notice of intolerable conditions so that the employer would have the opportunity to attempt corrective measures. Rather, in order to ensure that the resignation actually is employer coerced, we concluded that the better practice is to require proof that "the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Id.* at p. 1251.)

Mullins alleged that he was constructively discharged in breach of an implied contract not to terminate his employment absent good cause. In our recent decision in *Romano, supra,* 14 Cal.4th 479, we determined that the statute of limitations applicable to a claimed breach of an implied contract not to terminate employment without good cause begins to run at the time of actual termination of employment, even when the employer has issued an unequivocal notification of termination at an earlier date. (*Id.* at p. 491.) We noted that in a contract action, the statute of limitations does not begin to run before the alleged breach occurs, and that the breach of promise alleged in *Romano* consisted of the *termination* of employment without good cause. (*Id.* at p. 488.) In addition, we observed that even if the notification of termination in that case were viewed as a breach of the employment contract, such notification constituted an anticipatory breach that gave the plaintiff an election of remedies. (*Id.* at p. 489.) The plaintiff could elect to sue on the breach at once, or he or she could elect to continue to perform until the breach announced by the defendant came to pass. Because the plaintiff in *Romano* elected to continue to perform, we concluded that the statute of limitations began to run when the defendant's announced breach actually came to pass, that is, when employment terminated. (*Id.* at p. 491.)

Similar reasoning applies to a breach of contract action based upon an alleged constructive discharge. The breach of contract alleged is the *termination* of employment without good cause. To the extent the employer's creation or knowing exploitation of intolerable working conditions for the purpose of securing a resignation in the future also may be a breach of contract, it is similar to an announcement that employment will be terminated in the future. Even more on point is the example of the contract that contemplates ongoing performance over a period of time. As we said in *Romano, supra,* 14 Cal.4th 479, "whether the breach is anticipatory or not, when there are ongoing contractual obligations the plaintiff may elect to rely

on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract. [Citation.] In the context of successive breaches of a continuing contractual obligation, we have explained: ' "In such a contract, where the parties did not mutually abandon or rescind it upon a breach or successive breaches, the injured party could wait until the time arrived for a complete performance by the other party and then bring an action for damages for such breaches. [Citation.] Respondent was not bound to treat the contract as abandoned on the first breach of it, or on any particular breach, but had his election to still rely on it, and the statute of limitations could not begin to run until it had made its election." ' " (*Id.* at pp. 489-490.)

■ In the present case, Mullins alleged that the termination of his employment was a breach of contract. Any possible earlier breach of contract committed through the alleged creation of intolerable working conditions did not rescind the contract, for Mullins continued to perform (or, for certain periods, to take temporary leave authorized by the employer while hoping for an amelioration of his employment situation) until he resigned. Under these circumstances, he had an election of remedies, and the statute of limitations did not begin to run until he made that election by resigning.

■ Rockwell objects that if the statute of limitations runs from the date of actual termination of employment pursuant to a constructive discharge, the employee will control the limitations period, because it is up to the employee to decide when to leave his or her employment. Rockwell argues that this circumstance distinguishes constructive discharge from express termination of employment for the purpose of the statute of limitations. If the employee controls the date on which the statute of limitations begins to run, Rockwell argues, employers will live in ignorance of an impending lawsuit until memories have faded and evidence is difficult to gather. Rockwell claims that such a result is inconsistent with the policy of the statute of limitations to prevent the bringing of stale claims.

In this connection, Rockwell relies upon *Regents of University of California* v. *Superior Court* (1995) 33 Cal.App.4th 1710 [39 Cal.Rptr.2d 919] (*Regents*) (disapproved on other grounds in *Romano, supra,* 14 Cal.4th at p. 500). In that case, the Court of Appeal rejected the constructive discharge claim of a medical resident who was told to repeat her third year of residency or be excluded from the residency program. The court determined, in a conclusion inconsistent with our later *Romano* decision, that the date the resident was notified of the adverse employment decision—and not the date of actual termination of employment—was the date the statute of limitations began to run, and held that the resident could not avoid the running of the

statute of limitations by alleging a constructive discharge. (*Regents, supra,* 33 Cal.App.4th at pp. 1713, 1723.) The Court of Appeal stated that the date of actual termination should not be the date the statute of limitations begins to run for a constructive discharge claim, because such a date would be arbitrary and would vest complete control over the limitations period in the employee. (*Id.* at p. 1722.) The court decided that, in any event, no constructive discharge had been shown. (*Id.* at pp. 1722, 1723.)

Rockwell's concern to avoid vesting employees with sole control over the commencement of the statute of limitations period, which it asserts would leave employers unaware of the accrual of a cause of action until an employee resigns, is misplaced, as is the concern expressed by the Court of Appeal in *Regents, supra,* 33 Cal.App.4th 1710. The essence of constructive discharge is that it is a termination of employment secured *by the employer* through indirect means. The employer remains in control in that he or she coerces the employee's resignation. Just as an employer who gives advance notice of impending termination of employment has knowledge sufficient to prepare for a possible lawsuit, an employer who creates or knows of intolerable conditions is in the same position to be prepared for a possible lawsuit when the coerced resignation finally occurs. In addition, the alleged intolerable condition—a circumstance in the control of the employer— normally continues up until the time of resignation, so that the litigation will not relate to some long-ago event, but to recent circumstances. Nor is it true that having the statute of limitations run from the date of termination leaves the employee able to delay the bringing of a lawsuit indefinitely. The longer the employee delays his or her resignation, the more difficult it may be to prove that the allegedly intolerable conditions of employment actually were intolerable on an objective basis (see *Turner, supra,* 7 Cal.4th at p. 1254), or that it was these conditions that caused the employee's resignation. Further, the employer, who has created or permitted the persistence of known intolerable conditions, should not be able to complain of delay when the employee retains employment in the hope that conditions will improve or that informal conciliation may succeed.[1]

Rockwell also argues that the statute of limitations for constructive discharge should run from the date the employee is subjected to intolerable working conditions, on the theory that the employee suffers appreciable harm at that point. It argues that, at the latest, this date occurred in the present case on Mullins's last day on the job before his second medical leave, since no adverse personnel acts occurred thereafter. The statute of limitations in a contract action, however, does not run before the breach of

---

[1] *Regents, supra,* 33 Cal.App.4th 1710, is disapproved to the extent it is inconsistent with this opinion.

contract in question has occurred. (*Romano, supra*, 14 Cal.4th at p. 488.) We have explained that the breach alleged in the present case is the termination of employment. If the creation of intolerable conditions itself properly could be considered a breach of contract, the employee would have an election—because the contract is an ongoing one—to ignore the employer's breach and continue to perform in the hope that the breach may be cured. In this connection, we note that Mullins alleged that he hoped his employment situation would be ameliorated during his medical leaves. As in the case of express termination of employment, we do not believe it is appropriate to establish a statute of limitations rule that forces employees to resort to litigation at the earliest moment. As a practical matter, a rule requiring a lawsuit to be filed as soon as intolerable conditions begin would interfere with informal conciliation in the workplace. The filing of a lawsuit not only would stifle the parties' efforts to resolve differences informally; it would in most cases prompt the employee to resign at the earliest date to avoid the awkwardness of maintaining employment while pursuing litigation against his or her employer. The statute of limitations should not force the employee to institute premature legal proceedings, whether at the time the employer announces an intention to fire the employee, or at the time the employer begins to coerce a resignation by creating or knowingly permitting intolerable working conditions. (See *Romano, supra*, 14 Cal.4th at pp. 494-495.) Finally, a rule providing that the statute of limitations begins to run on the date of actual termination of employment has the virtue of certainty. In contrast, it would be difficult to establish with certainty the event or events that set the statute of limitations running under the rule proposed by Rockwell.

Rockwell also argues that federal court decisions support its claim that the statute of limitations in a constructive discharge case should run from the time the employer created the conditions the employee alleges were intolerable. It relies particularly upon *Davidson* v. *Indiana-American Water Works* (7th Cir. 1992) 953 F.2d 1058 (*Davidson*) and *Lempres* v. *CBS Inc.* (D.D.C. 1996) 916 F.Supp. 15.

In *Davidson, supra*, 953 F.2d 1058, an employee claimed a transfer that removed her from a desirable work assignment constituted a constructive discharge in violation of the federal Age Discrimination in Employment Act (29 U.S.C. § 621 et seq.). The federal court, measuring from the date of the transfer and not from the date of actual termination of employment, held that the claim was untimely. It held that under the federal statute, the "limitations period begins to run on the date that the defendant takes some adverse personnel action against the plaintiff, and not when the full consequences of the action are felt." (*Davidson, supra*, at p. 1059.) It relied upon *Delaware*

*State College* v. *Ricks* (1980) 449 U.S. 250, 258 [101 S.Ct. 498, 504, 66 L.Ed.2d 431], in which the United States Supreme Court held that the limitations period for a claim under title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) began to run when the employee was notified he would not receive tenure, and not from the date his contract of employment actually ended. The high court declared that it was the decision to deny tenure that constituted the discrimination prohibited by the statute, and that the termination of employment was only an inevitable consequence of the earlier act of discrimination. (*Delaware State College* v. *Ricks, supra,* 449 U.S. at pp. 257-258 [101 S.Ct. at pp. 503-504].)

In *Romano, supra,* 14 Cal.4th 479, however, we declined to apply the rule set out in *Delaware State College* v. *Ricks, supra,* 449 U.S. 250, in the context of a claim under our state's Fair Employment and Housing Act. (Gov. Code § 12900 et seq.) We explained that because the state statute defines a "discharge" on specified grounds as an unfair employment practice, and because the statute's limitations period provides that no complaint may be filed after the expiration of a year from the date the unlawful practice "occurred," "it would be anomalous for us to conclude that the limitations period for that unlawful practice begins to run prior to discharge." (*Romano, supra,* 14 Cal.4th at p. 497.) We said, in addition, that it seemed inconsistent with basic contract principles to require the employee to bring a lawsuit before actual discharge—referring to the rules stated above that, even when a contract is repudiated before performance is due, or when a continuing contractual obligation is breached but the plaintiff continues to perform, the plaintiff may elect not to bring a lawsuit during the period he or she continues to perform. (*Id.* at pp. 497-498.)

*Davidson, supra,* 953 F.2d 1058, involves a statutory scheme defining the act of discrimination as a wrong, and follows the federal practice of holding that the statute of limitations begins to run on such claims from the time the decision to discriminate is made and communicated to the employee. We note some contrary federal authority in the context of constructive discharge (*Armington* v. *School Dist. of Philadelphia* (E.D.Pa. 1991) 767 F.Supp. 661, 665), but in any event, as in *Romano,* we decline to follow the federal authority upon which Rockwell relies. We see no reason to conclude the federal rule applicable to federal statutory claims should be adopted with respect to a state common law contract action based upon a termination of employment, particularly in light of our statements in *Romano* that the federal rule appears inconsistent with settled law regarding the statute of limitations applicable to contract actions.

*Lempres* v. *CBS Inc., supra,* 916 F.Supp. 15, does not persuade us to reach a contrary result. In that case, the employee claimed that the employer

discriminated against her during the period of employment and prevented her from returning to work at a desirable position after a maternity leave. She alleged a constructive discharge in violation of the District of Columbia Human Rights Act. The statute required actions to be filed within one year of the occurrence of the unlawful discriminatory practice. The court held that no adverse employment actions had occurred during the limitations period and held the action time-barred. That case, like *Davidson, supra,* 953 F.2d 1058, is not persuasive, because the case involves a statutory scheme specifying the act of discrimination as the date from which the limitations period runs, and because of the rules regarding the statute of limitations applicable to contract actions, discussed above.

Because (1) constructive discharge is an employer-directed termination of employment, (2) termination normally is the breach alleged, and (3) the employee may elect to overlook earlier adverse actions of the employer in the hope of conciliation, we conclude that the statute of limitations does not begin to run until actual termination. An employee is not barred from bringing his or her claim on the basis of the statute of limitations as long as the claim is brought in a timely manner after the actual termination of employment.

## III

For the foregoing reasons, the judgment of the Court of Appeal is reversed to the extent it bars plaintiff's contract causes of action on statute of limitations grounds.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.